### DAVIS v. GREAT EASTERN CASUALTY CO.

1. INSURANCE—ACCIDENT INSURANCE—UNNECESSARY EXPOSURE TO OBVIOUS DANGER.

In an action on an accident policy, where the defense was that insured met his death while "unnecessarily exposing himself to obvious danger," contrary to the terms of his policy, by attempting to leave a moving elevator, the trial court properly instructed the jury that plaintiff could not recover if deceased attempted to get out of the elevator while it was in motion nor when the doors were being closed preparatory to setting it in motion, but that he had a right to get off the elevator when it was standing still, and if, while in the act of getting off, the elevator started and he was injured, that his estate could recover.

2. SAME — COMMON CARRIER — PUBLIC CONVEYANCE—ELEVATORS— CONSTRUCTION OF POLICY.

Where the policy in one clause provided for indemnity against accident while traveling within "any common carrier's public passenger conveyance," and in another "while a passenger within an elevator provided for passenger service only," held, to be apparent that an elevator was not deemed to be a "public passenger conveyance," within the

The question of exposure to obvious risks of injury or obvious danger within the meaning of accident insurance is passed upon in a note in 50 L. R. A. (N. S.) 1218.

terms of the policy, and that insured was indemnified against two different and unconnected risks: one while riding in a conveyance, and the other while a passenger in an elevator.

3. SAME—PUBLIC CONVEYANCE—ELEVATORS.

The provisions of the policy limiting liability if the injury to the insured is received "while entering or leaving, or attempting to enter or leave, or while upon the step or steps, or platform or running board of any conveyance," *held*, not applicable where the injury was received while leaving a passenger elevator.

Error to Kent; Perkins (Willis B.), J. Submitted January 14, 1920. (Docket No. 92.) Decided February 27, 1920.

Assumpsit by Elvert M. Davis, administrator, with the will annexed, of the estate of James W. Hunter, deceased, against the Great Eastern Casualty Company on a policy of accident insurance. Judgment for plaintiff. Defendant brings error. Affirmed.

*Travis, Merrick, Warner & Johnson,* for appellant.

*James H. Campbell (E. M. Davis,* of counsel), for appellee.

SHARPE, J. On June 10, 1917, the defendant company issued to James W. Hunter an accident and sickness policy. It insured the deceased—

"against the effects of bodily injuries caused directly, solely and independently of all other causes by external, violent, and accidental means, * * * and also against the effects of sickness as follows:

Accident Benefits.

|  | In First Year of Policy | Annual Increase for five years | After 5th year |
|---|---|---|---|
| Section A. |  |  |  |
| For loss of life | $2,000 | $200 | $3,000 |

* * * only when such injuries are sustained in the

manner specified in Section C, clauses 1, 2 and 3.
* * *

"Section C.—1. While traveling as a passenger in a place regularly provided for passengers, within any common carrier's public passenger conveyance (animals, aerial machines or conveyances excepted) ; or

"2. While a passenger within an elevator provided for passenger service only; or

"3. While within any burning building except a shop or factory, by being burned by fire or suffocated by smoke, provided the insured shall not be assisting or acting as a volunteer or paid fireman." * * *

Under "Additional Provisions," it is provided:

"(b) This insurance does not cover * * * loss * * * from injuries fatal or otherwise resulting wholly or in part directly or indirectly from * * * unnecessary exposure to obvious danger" * * *

"(e) This insurance does not cover loss from injuries, fatal or otherwise, received by the insured while entering or leaving, or attempting to enter or leave, or while upon the step or steps, or platform or running board of any conveyance except under section D, E or F."

On July 2, 1917, the deceased, while attempting to pass out of an elevator at the third floor of the Browning Hotel in the city of Grand Rapids, sustained injuries resulting in instant death. The plaintiff was appointed administrator with the will annexed of his estate. Proofs of loss were furnished the defendant. Upon payment being refused, plaintiff brought this suit to recover the $2,000 provided for in said policy to be paid in case of death.

The defendant, in a notice attached to its plea, alleged that the injuries which caused the death of plaintiff's decedent were received—

"while entering or leaving or attempting to enter or leave a conveyance, to wit, the passenger elevator in the Hotel Browning"—

—and also that the injury was caused by the deceased

"unnecessarily exposing himself to obvious danger."

The circuit judge submitted both questions to the jury. He defined the latter, and as to the former said that the deceased—

"had a right to get off the elevator when it was standing still, and if while in the act of getting off, the elevator started and he was injured, that his estate can recover."

The jury found for the plaintiff in the amount of $2,000, with interest, $137.50. Judgment was entered therefor, and defendant appeals.

1. Did the deceased unnecessarily expose himself to an obvious danger? The only witness to this unfortunate occurrence was John Henry Guest, the man who was running the elevator. His description of the elevator itself and how it was operated was as follows:

"The elevator runs from the basement to the top floor and is operated by electricity. The doors at the different floors are double doors, in two parts. They open both ways and are placed on wheels or iron pulleys at the top of the doors. The doors slide together in the middle like little barn doors and when closed fasten together. After they were closed they cannot be opened only from the inside. The doors were hung on two iron rods at the top. The wheels at the top of the doors run along these rods from side to side. The doors are attached to the elevator opening. The doors are on the inside of the elevator shaft. The doors at each floor are arranged so that they open and close together. The elevator is operated, started and stopped by a lever at the righthand side of the elevator. The operator faces the south, that is, toward the halls running from the elevator shaft. The doors open and close with a device we had, a little patent device we had, we put our hand on as soon as we reached the floor. We attach this little device and the doors opened, and when we got ready to leave the floor we would close them. The device opened and closed both doors at once.

"* * * The elevator was ascending and Mr. Hunter stepped on the elevator and a lady stepped on the elevator at the same time; the lady was going to the third floor and Mr. Hunter I supposed was going to the fourth floor. They got on the elevator at the lobby or office floor. The lady stepped into the elevator first and then Mr. Hunter. The lady didn't say anything about what floor she wanted. I knew what floor she was on and wanted. The lady was Mrs. Mooney. She was stopping at the hotel. Mr. Hunter had just taken apartments in the hotel, on the fourth floor. He called for the fourth floor when he got on the elevator; when they both got into the elevator I started the elevator up after closing the door, and when I got to the third floor I stopped the elevator to let Mrs. Mooney out. Mr. Hunter stood directly behind Mrs. Mooney. I opened the doors on the third floor and Mrs. Mooney stepped out and started down the hallway, I closed the door and Mr. Hunter stepped out on the same floor.

"*Q.* Did you close the doors of the elevator before you started the elevator?

"*A.* Yes, sir, I was closing them.

"*Q.* Had they been closed when you started the elevator?

"*A.* The doors were closed nearly that far (indicating) when I started the elevator at the third floor. Mr. Hunter was directly behind Mrs. Mooney as she stepped out and started down the hall. Mr. Hunter stepped to the door, the elevator door, and he stepped out, and as he stepped out I hollered to him that this was not his floor. As he stepped out, I says: 'This is not your floor.'

"*Q.* You said that when you say that he was stepping out?

"*A.* No, before. I couldn't see him right good. I know he was standing behind the lady but I was paying attention to the floor. I opened the door at the third floor; Mrs. Mooney stepped out. I saw Mr. Hunter draw near. I said: 'This is not your floor, Mr. Hunter.' I shut the door. He was then on his way out to follow the lady. He had a paper in his hand and his hat was in his hand.

"*Q.* What happened?

"*A.* The elevator, well, I should judge, went up about three feet before Mr. Hunter's head struck the top, and I reversed the car. His head struck the iron casing at the top of the door, that is, the iron rail in casing on which the wheels of the door run. As the elevator went up, it carried Mr. Hunter along with it and his head struck this rail. Mr. Hunter had partly stopped. I tried to grab him with this hand. I hollered at him first and then I tried to catch him and pull him. He had stepped then so that I couldn't and I reversed the elevator after we had gone up about three feet. The door is about seven feet high. At that time one foot was out of the elevator and the other was on the floor of the elevator. I think he had stepped out with his right foot. It didn't seem to me that the foot that he extended out of the elevator reached the floor of the hall."

On cross-examination he was asked:

"*Q.* Did Mr. Hunter make any move to step off the elevator before you started up again?

"*A.* I couldn't see Mr. Hunter until I had seen him stepping out. He was directly behind Mrs. Mooney. At the time I seen him stepping out the elevator was then moving. I supposed the doors were nearly closed and I seen Mr. Hunter do this, and I hollered to Mr. Hunter. He got one foot clear out of the elevator."

There are apparent contradictions in his testimony as to the position of the doors when the deceased attempted to alight therefrom. One cannot but be impressed with the conviction that he was seeking to excuse himself from blame in starting the elevator before the door was closed. It was a physical impossibility for the deceased to step out, or attempt to step out, of the elevator after the doors were closed, as he states. The jury might well have found, as they apparently did find, under the charge of the court, that Guest started the elevator before closing the door and at the very moment deceased was in the act of stepping out. If such were the fact, it cannot well be said that he unnecessarily exposed himself to ob-

vious danger. This language is so plain, and so easily understood, that the jury needed no instruction as to its meaning. It was, however, defined by the trial judge, and we find no criticism thereof. The jury were also specifically instructed that the plaintiff could not recover if the deceased attempted to get out of the elevator while it was in motion or when the doors were being closed preparatory to setting it in motion.

2. Does the limitation in paragraph (e), above quoted, relieve the defendant from liability? We are fully in accord with the claim of defendant's counsel,—

"that every word in an insurance policy means something and was put there for a purpose. Every provision has some meaning and the interpretation by which a provision in a policy is made useless and of no effect is avoided by the courts where another interpretation would make the provision mean something"

—and with the quotation from page 416 of volume 1 of Corpus Juris,—

"A policy of accident insurance must if possible be so·construed as to give effect to all the language used," —cited by them.

This language is plain, and should be easily understood. The deceased was to be indemnified if injured, *first*, while traveling as a passenger in any public passenger conveyance, and, *second*, while a passenger within an elevator provided for passenger service only. It is apparent that an elevator was not deemed or considered as a "public passenger conveyance," else the specific provision as to it would not have been added. The insured was indemnified against two different and unconnected risks. One was while riding in a conveyance, and the other while a passenger in an elevator. To this his attention was called in plain and unmistakable language.

Let us now turn to paragraph (e), in which the limitation of liability relied on is found. In it, the

defendant is relieved if the injury to the insured is received "while entering or leaving, or attempting to enter or leave, or while upon the step or steps, or platform or running board of any conveyance." We believe that the understanding of any person accepting such a policy would be that the words "any conveyance" so used referred to the "public passenger conveyance" specified in section C—1, and had no connection with the word "elevator" in section C—2. We feel strengthened in this conviction by a consideration of the entire paragraph. There is greater danger of accident "when entering or leaving, or attempting to enter or leave, or while upon the step or steps, or platform or running board" than when riding in such a conveyance. From this extra hazard, the defendant sought to relieve itself to the extent to which its liability was lessened under other provisions as to payments. Should the death of deceased be held to have occurred while alighting, etc., from such a conveyance, its liability would be but $50. Elevators have no platforms, steps or running boards. The use of these terms in connection with the word "conveyance" is persuasive that it was intended and understood by the contracting parties to mean a vessel, vehicle or car so equipped, and employed in the general conveyance of passengers. Giving this interpretation to the language of paragraph (*e*), we find no error in the charge of the court prejudicial to the defendant. The only question for the consideration of the jury was whether deceased unnecessarily exposed himself to obvious danger. The jury found that he did not.

The judgment is affirmed.

MOORE, C. J., and STEERE, BROOKE, FELLOWS, STONE, CLARK, and BIRD, JJ., concurred.